**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

MARK E. CANNON,

                              Plaintiff,

            - v -                                                Civ. No. 9:10-CV-01332
                                                                           (GTS/RFT)

**C.O. E. WOOD**, *Upstate Correctional Facility,* **SAINT**
**MARY**, *Correctional Officer*, *Upstate Correctional Facility*,
**RELF**,[1] *Correctional Officer*, *Upstate Correctional Facility*,
**WINSTON**, *Correctional Officer*, *Upstate Correctional Facility*,
**M. EDDY**, *Sergeant*, *Upstate Correctional Facility*,

                              Defendants.

**APPEARANCES:**                                  **OF COUNSEL:**

**MARK E. CANNON**
08-A-0822
Plaintiff, *Pro Se*
Great Meadow Correctional Facility
Box 51
Comstock, NY 12821

**HON. ERIC T. SCHNEIDERMAN**                **KRISTA A. ROCK, ESQ.**
Attorney General of the State of New York     Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

        Plaintiff, Mark E. Cannon, brings this civil rights claim pursuant to 42 U.S.C. § 1983,

alleging that Defendants, who are Corrections Officers at Upstate Correctional Facility, violated his

rights under the First, Eighth, and Fourteenth Amendments.  Dkt. No. 1, Compl.  According to

---

[1] Upon information and belief, the correct spelling of this Defendant's name is "Reif" and the Court will refer
to him accordingly.  *See* Dkt. No. 59-6, Brad Reif Aff., dated Aug. 2, 2012.

Plaintiff: (1) Defendants Winston and St. Mary encouraged another officer to file a false misbehavior report against him in retaliation for filing a grievance against them; (2) Defendants Reif and Wood used excessive force against him; and (3) Defendant Eddy failed to protect him from the use of excessive force. *Id.* Defendants move for Summary Judgment claiming, *inter alia,* that: (1) Plaintiff failed to sufficiently state any of the aforementioned claims; and (2) Defendants are entitled to qualified immunity. *See* Dkt. No. 59. Plaintiff opposes the Motion. Dkt. No. 63. And, Defendants have Replied to Plaintiff's Opposition. Dkt. No. 64.[2] For the reasons that follow we recommend that the Defendants' Motion for Summary Judgment be **GRANTED in part and DENIED in part.**

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d

---

[2] In their Reply Defendants claim that because Plaintiff failed to address certain claims in his Opposition, the Court should find that he has abandoned them. *See* Dkt. No. 64, Defs.' Reply at pp. 2–3. However, this Court will not make such a finding in light of the Plaintiff's *pro se* status. *Cf. Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995).

Cir. 1992).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, mere conclusory allegations,

unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## B. Summary of Facts

At all times relevant to this action, Plaintiff was an inmate housed in 10 Building on the upper A Gallery at Upstate Correctional Facility and Defendants were employed by the New York State Department of Correctional Services.[3] *See* Dkt. No. 59-1, Defs.' Statement Pursuant to Rule 7.1(a)(3) (hereinafter "Defs.' 7.1 Statement") at ¶¶ 1–2. Upstate inmates are awarded different privileges according to a tri-level, merit based classification system. *Id.* at ¶¶ 16–19. All incoming inmates begin on level one, which provides the fewest privileges. *Id.* at ¶¶ 17 & 19. After thirty days without receiving a misbehavior report an inmate rises to the next level, with level three being the highest level attainable. *Id.* at ¶¶ 18 & 19. When a prisoner receives a misbehavior report, he automatically loses any heightened level of privileges he may have earned, and must begin again at level one. *Id.* at ¶ 20.

All Upstate inmates housed in 10 Building are entitled to go to the barbershop once a month. *Id.* at ¶ 5. During the Spring of 2010, Defendants Winston's and St. Mary's job duties included escorting inmates to the barbershop. *Id.* at ¶ 4. In February of 2010, Plaintiff filed a grievance alleging that he had been denied barbershop privileges that month. Compl. at ¶ 6(C). Thereafter, in March of 2010, Plaintiff was able to go to the barbershop and have his beard trimmed. Defs.' 7.1 Statement at ¶ 13. Then in April, Plaintiff wrote grievances against Defendants Winston and St. Mary alleging that they were harassing him. Dkt. No. 63-2, at (unnumbered) pp. 54 & 55.

On May 12, 2010, Plaintiff was classified as a level three inmate. *Id.* at ¶ 21. On that

---

[3] In April 2011, the New York State Division of Parole and the New York State Department of Correctional Services merged into one agency now known as the Department of Corrections and Community Supervision.

morning, Defendant St. Mary and Correction Officer (C.O.) Price[4] were collecting "feed up trays" – the trays on which meals are served to prisoners in their cells – through the "feed up slots" in the cell doors. *Id.* at ¶¶ 3, 23, & 27. Price stopped at Plaintiff's cell to retrieve the feed up trays from Plaintiff and his cellmate, while Defendant St. Mary walked ahead to collect trays from nearby cells. However, Price shut the feed up slot on Plaintiff's cell door without collecting Plaintiff's feed up tray. *See* Dkt. No. 59-9, Kevin St. Mary Aff., dated July 25, 2012, Ex. A, Video Tape L10-313 (Cell Block Video).

Thereafter, Price reported to the area supervisor, Defendant Sergeant Eddy, that Plaintiff disobeyed a direct order to turn over his feed up tray. Defs.' 7.1 Statement at ¶ 35. Defendant Eddy then went to Plaintiff's cell and collected the feed up trays, at which time he also confiscated several feet of "drag lines"[5] that were clearly visible from the front of Plaintiff's cell. Cell Block Video at 8:27:30–8:28:05; Defs.' 7.1 Statement at ¶¶ 36–37; Dkt. No. 59-8, Krista Rock, Esq. Decl., dated July 30 2012, Ex. A, Mark E. Cannon Dep., dated May 17, 2012, at p. 36, lines 22–24. As a result of this incident, C.O. Price filed an inmate misbehavior report charging Plaintiff with a messhall violation, refusing a direct order, and destroying state property. Defs.' 7.1 Statement at ¶ 46. As a result of the issuance of the misbehavior report, Plaintiff lost his level three status. Compl. at ¶ 6(F).

At some point on the morning of May 12, a routine pat frisk of Plaintiff was conducted. Defs.' 7.1 Statement at ¶ 52. The pat frisk revealed that Plaintiff was attempting to smuggle a pair of headphones by concealing them on his body. *Id.* at ¶ 53. Plaintiff admitted to smuggling the

---

[4] Price is not named as a Defendant in this action.

[5] Drag line is a sort of rope made by tearing up state issued prison sheets and tying the pieces together. *See* Defs.' 7.1 Statement. at ¶ 36.

headphones. *Id.* Per standard operating procedure, Plaintiff was then taken to the Draft Room, and a body orifice scan and a full strip frisk were conducted. *Id.* at ¶¶ 54–56. The strip frisk revealed that Plaintiff was also attempting to smuggle two packets of peanut butter in his rectal area. *Id.* at ¶ 57. Plaintiff admitted to smuggling the peanut butter.[6] *Id.* at ¶ 58.

After completing the strip search, Defendant Wood instructed Plaintiff to stand facing the wall in the draft area and await an escort back to his housing unit. *Id.* at ¶ 59. Notwithstanding Wood's orders, Plaintiff turned his head to the left. Defs.' 7.1 Statement at ¶ 65. Defendants maintain that Plaintiff turned his head in "an aggressive manner." Defs.' 7.1 Statement at ¶ 65. Plaintiff claims that he was not acting in an aggressive manner and that the Defendants "knew [he] wasn't being aggressive." Pl.'s Opp'n at ¶¶ 62, 65, & 68. Defendant Wood then makes contact with the Plaintiff's body. Although it is clear from the video that contact was made, it is not clear exactly what type of contact occurred or how much force was used; a point to which the parties have provided opposing accounts. *See* Dkt. No. 59-12, Eric Wood Aff., dated Aug. 2, 2012, Ex. A, Video Tape L10-311 (Draft Room Video), at 11:07:38–11:07:45.

After Defendant Wood makes contact with Plaintiff, Defendant Reif positions himself on Plaintiff's left side and takes hold of Plaintiff's left arm. Draft Room Video at 11:07:42. Defendant Eddy approached the three men, but did not physically interject himself. *Id* at 11:07:42–11:07:50. Defendants Reif and Wood continued to maintain some type of contact with Plaintiff until Plaintiff is turned over to an unidentified officer. Draft Room Video at 11:07:42–11:13:45. It is unclear from the video precisely how much force was used during the incident.

Sometime thereafter, and as a result of the incident in the Draft Room, Defendant Wood

---

[6] According to Plaintiff, he was attempting to smuggle the peanut butter because he anticipated being put on "the loaf," a restricted diet. Cannon Dep. at p. 43.

authored an inmate misbehavior report charging Plaintiff with violent conduct, refusing a direct order, and smuggling in violation of Department of Corrections and Community Supervision rules. Defs.' 7.1 Statement at ¶ 87. Defendants also filed a "use of force" report regarding the incident in the Draft Room. Dkt. No. 59-13, Wood Aff., Ex. B, Use of Force Report, dated May 12, 2010.

After the incident in the Draft Room, a registered nurse at Upstate examined Plaintiff in a holding pen and reported that he was "seen in holding pen[,] refused to strip to shorts[,] claims neck & head pain[,] no injuries noted at this time." Wood Aff., Ex. B at pp. 2–3.

On May 25, 2010, a Tier III Disciplinary Hearing was held concerning the May 12, 2010 Misbehavior Reports filed by Defendant Wood and C.O. Price. Defs. 7.1 Statement at ¶ 88. Plaintiff pled guilty to smuggling and refusing a direct order, as set forth in Wood's Misbehavior Report, and was found guilty of the remaining charges in both misbehavior reports. *Id.* at ¶¶ 89–90.

## C. Retaliation

Plaintiff asserts that in retaliation for filing grievances against Defendants Winston and St. Mary in February and March of 2012 , Defendant St. Mary encouraged officer Price to file a false disciplinary report against him accusing him of refusing to return his feed up tray on May 12, 2010. Dkt. No. 63-1, Mark Cannon Aff., dated Aug. 17, 2012, at ¶ 3. And, as a result, Plaintiff lost his level three status and concomitant privileges. Defendants argue, *inter alia*, that the misbehavior report was not false and, even if it was, Plaintiff's claim fails because Plaintiff was also found in possession of drag lines, a clear violation of prison rules. Defs.' Mem. of Law at pp. 12–13. Thus, they contend that Plaintiff would have lost his level three privileges even if he had not been charged with disobeying a direct order to turn in his feed up tray, because the penalty for having drag lines is the same as the penalty for disobeying a direct order. *Id.* at pp. 12–13. For the reasons that

follow, we agree with the Defendants, and recommend that the Defendants' Motion for Summary Judgment be **GRANTED** as to the Plaintiff's First Amendment retaliation claim against Defendants Winston and St. Mary.

The Second Circuit has made clear that while an inmate has no constitutional protection against false accusations, an inmate does have a substantive due process right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances. *Jones v. Coughlin,* 45 F.3d 677, 679-80 (2d Cir. 1995); *Franco v. Kelly,* 854 F.2d 584, 589-90 (2d Cir. 1988). Claims of retaliation, like those asserted by Plaintiff, find their roots in the First Amendment. Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *Gill v. Pidlypchak*, 389 F.3d 379, 381-83 (2d Cir. 2004).

Because of the relative ease with which claims of retaliation can be invoked, courts should examine such claims "with skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citation omitted); *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ("[V]irtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." (citation omitted)); *see also Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected activity, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*,

389 F.3d at 380 (citing *Dawes v. Walker*, 239 F.3d at 492); *see also Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002).

      The plaintiff bears the initial burden in showing that the defendant's actions were improperly motivated. To satisfy the second prong, a prisoner must present evidence inferring that a defendant acted with an improper motive. Such evidence includes: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) plaintiff's prior good disciplinary record; (3) plaintiff's vindication at his disciplinary hearing; and (4) defendants' statements regarding their motive for the discipline. *See Colon v. Coughlin*, 58 F.3d at 872-73. A plaintiff may meet this burden by presenting circumstantial evidence of a retaliatory motive, thus obviating the need for direct evidence. *Bennett v. Goord*, 343 F.3d 133, 139 (2d Cir. 2003) (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia*, the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (citing *Dawes v. Walker*, 239 F.3d at 493). Otherwise, the retaliatory act is "*de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker*, 239 F.3d at 493. Furthermore, in satisfying the causal connection requirement, also known as temporal proximity, the allegations must be "sufficient to support the inference that the speech played a substantial part in the adverse action." *Id*. at 492 (internal quotation marks and citations omitted) (cited in *Davis*, 320 F.3d at 353).

      In situations where the defendant's actions are the result of both retaliatory and legitimate

reasons, the burden shifts to the defendants to show that they would have taken the same action absent the retaliatory motive. *Graham v. Henderson*, 89 F.3d at 79 (citing, *inter alia*, *Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287 (1977)); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir. 1994) (cited in *Carpio v. Walker*, 1997 WL 642543, at *6 (N.D.N.Y. Oct. 15,1997)); *see also Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (defendant may successfully meet this burden of justification with regard to a particular punishment by demonstrating that "plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report" (internal quotation marks and citations omitted)).

Assuming, *arguendo*, triable issues of fact exist regarding each of the material elements of the Plaintiff's retaliation claim, such a finding would have no effect on the ultimate outcome of this case because Defendants would still be entitled to summary judgment as a matter of law. Plaintiff readily admitted that when Sergeant Eddy came to collect the missing trays, he also confiscated drag lines from Plaintiff's cell. *See* Cell Block Video; Cannon Dep. at p. 36. Furthermore, Plaintiff readily admits that the drag lines were made by destroying state property – ripping up state issued sheets. Cannon Dep. at p. 36. Destruction of state issued property is a violation of prison rules. *Ergo*, because of this violation, Plaintiff would still have lost his level three privileges. *See e.g., Graham v. Henderson*, 89 F.3d at 79. Having met their burden, Defendants are entitled to judgment as a matter of law on this issue and therefore we recommend that the Defendants' Motion for Summary Judgment be **GRANTED** with respect to Plaintiff's retaliation claim against Defendants Winston and St. Mary.

### D. Eighth Amendment

Plaintiff brings two claims under the Eighth Amendment: (1) a claim against Defendants

Wood and Reif for using excessive force against him in the Draft Room on May 12, 2010; and (2) a claim against Defendant Eddy for failing to protect him from the use of excessive force during that same incident. Defendants argue that they are entitled to summary judgment on the excessive use of force claim because: (1) the use of force was part of a good faith effort to maintain order and safety; (2) the amount of force used was only the minimum amount required to regain control of a prisoner who had violated a direct order; and (3) Plaintiff suffered no injuries. Additionally, Defendants argue that they are entitled to summary judgment on the Plaintiff's failure to protect claim because the use of force was so brief that Defendant Eddy did not have a reasonable opportunity to intervene.

We recommend that Defendants' Motion for Summary Judgment as to the excessive force claim be **DENIED**, because we find that triable issues of material fact exist regarding whether Defendants were acting in good faith to maintain order and control, or with a malicious intent to cause harm. Likewise, because we find that triable issues of fact exist regarding whether Defendant Eddy had a reasonable opportunity to intervene on Plaintiff's behalf, we recommend that summary judgment be **DENIED** as to Plaintiff's failure to protect claim.

## 1. Excessive Force

The Eighth Amendment prohibits the infliction of cruel and unusual punishment and is applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 666-67 (cited in *Tramell v. Keane*, 338 F.3d 155, 161 (2d Cir. 2003)). In *Hudson v. McMillian*, 503 U.S. 1 (1992), the Supreme Court clarified the standards for determining whether an Eighth Amendment violation occurred in the context of excessive force. Specifically, the Court stated that, "whenever prison officials stand accused of using excessive

*-11-*

physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in *Whitley* [*v. Albers*, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 6-7 (quoted in *Davidson v. Flynn*, 32 F.3d 27, 29 (2d Cir. 1994)). To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must prove two components: (1) objectively, that the defendant's actions violated "contemporary standards of decency," and (2) subjectively, that the defendant acted wantonly and in bad faith. *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotation marks and citations omitted).

Regarding the objective element, we note initially that "a *de minimis* use of force will rarely suffice to state a constitutional claim[.]" *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993). In that respect, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) (quoted in *Hudson v. McMillian*, 503 U.S. at 10). However, the malicious use of force to cause harm constitutes an Eighth Amendment violation *per se* because in such instances "contemporary standards of decency always are violated." *Blyden v. Mancusi*, 186 F.3d at 263 (citing *Hudson v. McMillian*, 503 U.S. at 9). For example, "when a prison guard applies force against a prisoner that poses no reasonable threat simply because the guard loses his or her temper and wishes to wantonly inflict pain on the prisoner, a per se violation of the Eighth Amendment occurs." *Beckford v. Portuondo*, 151 F. Supp. 2d 204, 216 (N.D.N.Y. 2001) (citation omitted).

In assessing the objective component, the court should consider the seriousness of the injury, however, "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury;" thus, "the seriousness of the

injury is relevant to the Eight Amendment inquiry, but does not end it." *Davidson v. Flynn*, 32 F.3d 27, 29-30 n.1 (2d Cir. 1994) (alterations in original) (quoting *Hudson v. McMillian*, 503 U.S. at 4).

With regard to the subjective component, a court should consider whether the defendant had a wanton state of mind when engaging in the alleged misconduct. To determine whether a defendant acted wantonly or maliciously, several factors should be examined, including

> the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by defendants to temper the severity of a forceful response.

*Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted); *see also Hudson v. McMillian*, 503 U.S. at 7).

It is uncontroverted that on May 12, 2010, after being strip frisked, Plaintiff was escorted into the Draft Room, and, in accordance with established prison policy, Defendant Wood ordered Plaintiff to stand and face the wall, and not to turn his head. *See* Dkt. No. 59-4, Michael Eddy Aff., dated July 24, 2012, at ¶¶ 7–8; Wood Aff. at ¶¶ 7–8; Dkt. No. 59-6, Brad Reif Aff., dated Aug. 2, 2012, at ¶¶ 7–8; Cannon Dep. at pp. 44 & 46–47. It is likewise agreed by the parties that Plaintiff turned his head away from the wall. Cannon Dep. at p. 45; Wood Aff. at ¶ 9. Finally, it is indisputable that some amount of force was used. *See* Draft Room Video; Use of Force Report.

Defendants claim that force became necessary because Plaintiff had become increasingly loud and insubordinate during the minutes leading up to the incident, and turned his head away from the wall in an aggressive manner. Wood Aff. at ¶¶ 8, 9, & 11; Reif Aff. at ¶¶ 8, 9, & 12; Eddy Aff. at ¶¶ 8, 10, & 15. Plaintiff maintains that he was not acting in an aggressive manner and that the Defendants "knew [he] wasn't being aggressive," and that he turned his head because he was being asked a question. *See* Dkt. No. 63, Pl.'s Reply at ¶¶ 62 & 65–68; Cannon Dep. at p. 46. The Draft Room Video does not contain any audio, therefore, it is impossible to know what, if anything, was

*-13-*

said by any of the parties to the altercation.

The parties have likewise provided different accounts of how the force was imparted upon Plaintiff. Plaintiff claims that:

> When I turned my head, Wood grabbed my hair . . . with his hand and slammed my face into the wall, and took his thumb and pushed it behind my jaw to dislocate my jaw . . . and dug his nails into my neck . . .[then] CO Reif took my arms [which were] cuffed behind my back . . . and twisted them and pushed them up and held them there.

Cannon Dep. at p. 45, lines18–25.

Defendant Wood claims that when Plaintiff turned his head

> I put my left hand on Cannon's left shoulder area to passively restrain him . . . . I maintained pressure on Cannon's left shoulder to keep him from turning away from the wall, while also maintaining control of the mechanical restraints (handcuffs) that were on Cannon's wrist with my right hand . . . . Officer Reif took control of Cannon's left arm with both of his hands. Both Officer Reif and I maintained control of Cannon in this manner until we were relieved.

Wood Aff. at ¶¶ 10, 12, & 13.

Unsurprisingly, the parties' respective accounts of the Plaintiff's injuries vary greatly. Medical records offered by Defendants show that Plaintiff refused to strip down to allow the prison's registered nurse an opportunity to fully evaluate him, and the Use of Force Report states that the nurse "noted [Plaintiff had] no injuries at this time." Wood Aff., Ex. B at p. 2. Plaintiff claims that he suffered injuries to his neck, right shoulder, upper back, wrists, elbows, experienced extreme pain in his jaw for approximately three days while trying to eat, was unable to sleep for seven days, and still experiences extreme back and neck pain. Cannon Dep. at pp. 51–52; Compl. at ¶¶ 6(H) & 7–9.

Defendants argue that we should rely on the Draft Room Video in reaching our decision. Defs.' Mem. of Law at p. 19. However, the Draft Room Video contains no audio, and is of such low quality that it does little to substantiate either parties' account of the events of May 12, 2010. Thus, left only with the parties' vastly varying accounts, the record before us presents several triable issues

of material fact regarding whether the amount of force used by the Defendants was excessive. Moreover, a malicious use of force is *per se* unconstitutional, and as explained below, triable issues of material fact exist in this case as to whether force was used maliciously. *See Blyden v. Mancusi*, 186 F.3d at 263.

The variation in the parties' accounts present questions of fact material to the subjective element of Plaintiff's claim as well. For example, if Plaintiff's account is believed to be more credible, then it would not be unreasonable for a jury to find that at the time force was used, Plaintiff posed no threat to the Defendants. And, therefore, no amount of force could have been reasonable, no matter how minimal, because there was no need for the use of force in the first place. *See Scott v. Coughlin*, 344 F.3d at 291. It would naturally follow from such a conclusion, and a rational jury could find, that absent a good faith reason for using force, force was used maliciously. *Id.* Likewise, if the Defendants' story is found to be more credible, than a reasonable juror could determine that the use of force by Defendants Wood and Reif was made in a good faith effort to maintain order over a special housing unit prisoner, who was out of his cell, acting aggressively, and violating a direct order.

Thus, the final determination regarding whether the Defendants acted with the requisite mental state is one that can only be made by weighing the credibility of the evidence, a task that is expressly the province of the finder of fact, and not this Court. *See Scott v. Coughlin*, 344 F.3d at 291. Therefore, we recommend that the Defendants' Motion for Summary Judgment as to the excessive use of force claim against Defendants Wood and Reif be **DENIED**.

### 2. Failure to Protect

A prison inmate has a constitutional right under the Eighth and Fourteenth Amendments to

be free from the "unnecessary and wanton infliction of pain." *Hendricks v. Coughlin*, 942 F.2d 109, 112 (2d Cir.1991) (citation omitted). "The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994)); *Heisler v. Kralik*, 981 F. Supp. 830, 837 (S.D.N.Y. 1997) ("Prison officials have a constitutional duty to act reasonably to ensure a safe environment for a prisoner when they are aware that there is a significant risk of serious injury to that prisoner."); *see also Avincola v. New York State Dep't of Corr. Servs.*, 1998 WL 146280, at *3 (N.D.N.Y. Mar. 27, 1998).

In order to state such a claim, the prisoner must demonstrate that the prison officials "acted with deliberate indifference with respect to his safety or with an intent to cause harm to him." *Hendricks v. Coughlin*, 942 F.2d at 113. A showing of mere negligence on behalf of the defendants is not enough to state a constitutional claim. *Whitley v. Albers*, 475 U.S. at 319 (cited in *Hendricks v. Coughlin*, 942 F.2d at 113). The key element of a failure to protect claim is the existence or potential existence of a substantial risk of serious harm and not the actual harm which may or may not ensue. *Farmer v. Brennan*, 511 U.S. at 836. To prove deliberate indifference, the plaintiff must show that the "official [knew] of and disregard[ed] an excessive risk to inmate health or safety." *Id.* at 837 (cited in *Ramirez v. Mantello*, 1998 WL 146246, at *2 (N.D.N.Y. Mar. 24, 1998)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference." *Id.* (emphasis added). However, an officer may not be held liable where he had "no realistic opportunity" to intervene on an inmate's behalf. *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir. 1988) (finding no realistic opportunity to intervene where "three blows were struck in [] rapid succession."); *accord Curley v. Vill. of Suffern*,

268 F.3d 65, 72 (2d Cir. 2001); *see also Jean-Laurent v. Wilkinson,* 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) aff'd *Jean-Laurent v. Wilkerson*, 461 F. App'x 18 (2d Cir. 2012).

Moreover, a supervisor can be held liable when he or she has actual or constructive notice of unconstitutional practices, but similarly acted with gross negligence or deliberate indifference in failing to act. *See Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989). "Such a supervisor may not escape the consequences of his or her failure to act by pleading the doctrine of qualified immunity." *Fossett v. Morris*, 1991 WL 67093, at *3 (S.D.N.Y. Apr. 22, 1991).

Plaintiff contends that Defendant Eddy had a reasonable opportunity to intervene on his behalf when after the initial use of force, Defendants Wood and Reif continued to hold Plaintiff against the wall. *See* Pl.'s Opp'n at ¶¶ 83–85; Dkt. No. 63-1, Mark E. Cannon Aff., dated Aug. 17, 2012, at ¶¶ 9 & 12; Cannon Dep. at p. 55. And that, Defendant "Eddy failed to protect [him] by not telling [D]efendants [R]eif and [W]ood to take their hands off [him]." Pl.'s Opp'n at ¶ 86. Contrariwise, Defendant Eddy claims he had no opportunity to intervene on Plaintiff's behalf because "[e]ven if [he] had wanted to intervene . . . [b]y the time [he] reached Cannon's side the use of force had been completed and control of Cannon had been regained." *See* Eddy Aff. at ¶¶ 2, 10, 14, & 17.

Once again, due to the low quality of the video, it is impossible to substantiate either party's version of events from a review of the video alone. All that the video establishes is that after the initial contact, Defendants Wood and Reif continued to make some type of contact with Plaintiff until he was turned over to another officer. Draft Room Video at 11:07:38–11:14:38. Moreover, the video lacks audio, making it impossible to know what was or was not being said throughout the incident.

Whilst Defendants claim that only the minimum amount of force necessary was used during this period, Plaintiff claims that Defendant Reif twisted his arms, pushed them up into his shoulders and towards his neck, and held them there. Cannon Dep. at pp. 47 & 54. And "while defendant [E]ddy was standing there . . . there was pressure being applied to [Plaintiff's] jaw and head that was hurting [him]." Pl.'s Opp'n at ¶ 83. These diametrically opposing accounts present us with triable issues of material fact.

If Plaintiff's version of events is deemed credible, a reasonable jury could conclude the following: Defendants continued to use excessive force after the initial contact, Defendant Eddy was present and would have been aware that Plaintiff's rights were being violated, and Defendant Eddy had more than enough time to intervene on Plaintiff's behalf during the period Plaintiff was held. *See O'Neill v. Krzeminski*, 839 F.2d at 11-12 (although defendant had no reasonable opportunity to intervene on plaintiff's behalf when three blows were delivered in rapid succession, the defendant subsequently failed to intervene immediately thereafter while the inmate was dragged across the floor by his throat).

Because the parties' version of the events differ, we recommend that Defendants' Motion for Summary Judgment as to the failure to protect claim against Defendant Eddy be **DENIED**

### E.  Qualified Immunity

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Eng v. Coughlin*, 858 F.2d 889, 895 (2d Cir. 1988).  Whether an official protected by qualified

*-18-*

immunity may be held liable for an alleged unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Lewis v. Cowan*, 165 F.3d 154, 166 (2d Cir. 1999). Until recently, courts faced with qualified immunity defenses have applied the procedure mandated in *Saucier v. Katz*, 533 U.S. 194 (2001). That case set forth a two-pronged approach whereby the court must first decide whether the facts alleged, or shown, make out a violation of a constitutional right. If yes, the court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz*, 533 U.S. 194 at 201-02. Recently, however, the Supreme Court softened the rigid approach enunciated in *Saucier*. *See Pearson v. Callahan*, 555 U.S. 223 (2009). Now, the *Saucier* two-pronged test is not mandated in terms of the order in which the prongs may be addressed, though the sequence of review may remain appropriate or beneficial. *Id*. at 818.

To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the [Second Circuit] supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his [or her] actions were unlawful." *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir. 1995); *see also Nicholas v. Miller*, 189 F.3d 191, 195 (2d Cir. 1999).

Because we have found no evidence of First Amendment retaliation, we need not consider whether Defendants Winston and St. Mary are entitled to qualified immunity with regards to that claim. *Saucier v. Katz*, 533 U.S. at 201.

It is clear that a prisoner has the right to be free from cruel and unusual punishment, it is

equally clear that a corrections officer has a duty to protect inmates from the cruel and unusual punishment of other corrections officers." *Hendricks v. Coughlin*, 942 F.2d 109, 112 (2d Cir.1991) (citation omitted); *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). However, because we have already concluded that material issues of triable fact exist as to whether or not the remaining Defendants acted reasonably during the Draft Room altercation, we are likewise unable to determine whether the remaining Defendants acted reasonably for purposes of qualified immunity in regards to the Plaintiff's Eighth Amendment claim. Therefore any decision as to whether Defendants Reif, Wood, and Eddy are entitled to qualified immunity would simply be premature at this stage. *See Kimbrough v. Town of Dewitt Police Dep't*, 2010 WL 3724017, at *5 (N.D.N.Y. Sept. 15, 2010) (no qualified immunity on summary judgment where the court found triable issues of fact existed about " the circumstances of the incident alleged and the reasonableness of the officers' response," regarding the plaintiff's excessive force and failure to protect claims).

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 59) be **GRANTED** in so far as it pertains to Plaintiff's retaliation claims against Defendants Winston and St. Mary, and Defendants Winston and St. Mary should be dismissed from this action ; and it is further

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 59) be **DENIED** as to Plaintiff's remaining Eighth Amendment claims against Defendants Reif, Wood, and Eddy; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and

Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Date:   January 18, 2013
        Albany, New York


Randolph F. Treece
U.S. Magistrate Judge